Mr. Morris, we'll hear from you when you're ready. May it please the Court, Counsel. My name is James Morris, and I have the pleasure of representing Management Registry in this matter. This matter comes to the Court with regard to a TRO that was entered and then subsequently setting aside the TRO. Under the Coins case, the matter comes before the Court on an abuse of discretion. Where we need to start, though, is in the data phase matter. In data phase, it says that there are four factors that must be decided, and the Court's very familiar with those. Success on the merits, irreparable harm, balancing, and public interest. The Court below, in the ADD, the addendum that we referenced, pages 11 to 14, identified for this Court facts that this Court should take into consideration in deciding that there was, in fact, an abuse of discretion. The Court found that there was not a purchase by Wendy Brown. The Court found that Wendy Brown and Al Brown proceeded to create A.W. companies, and that Al Brown and Wendy Brown then, through A.W., solicited and hired MRI employees. Those MRI employees, and this is on ADD 14 or Addendum 14, those employees were solicited to solicit, I'm sorry, were solicited to obtain computers and client files. Proceeded to do so, and then A.W. utilized that information to then compete with Management Registry Incorporated. Now the criticality of those facts, and they are undisputed, cannot be understated. The Court below found Wendy Brown did not purchase the company, yet what does Wendy Brown in her memorandum, Documentary 23, says, I created A.W., and I did so to carry out what I was not able to do through a purchase. In layman's terms, she was trying to buy a car. She couldn't buy the car because we changed our mind. She went and got a set of keys and drove off in the car. That's what has happened here. In this case, she, quite frankly, and this is why our reply says this straight up front, what did they buy? If they claim that they own the computers, there are no receipts. They are our computers. They are our data. It is our employees. They are our contracts. Critical thing here, too, that the Court below found. We read to the Court on November 17, 2017, four emails from Eric Berg, as President of All Calls, a Division of Management Registry. This is what he said. As President of All Calls, a Division of Management Registry, I hereby waive the contract and all of the invoices. You're now released from those. Oh, by the way, here's our new contract with AW. Please sign. We presented to the Court below. One of the contracts that he sent still had track changes on it. In Word, you can track the changes in the document. The track changes showed that it was Management Registry's contract that still had the Management Registry name, All Calls, Division of All Staff Recruiting. He went through and changed that, referencing the new AW companies, presented it to the ARI customers, and then solicited them and got them to sign new contracts. Counsel, even aside from the specific evidence, I think both parties did not behave necessarily admirably. I'm sure you disagree with that, but I mean, you have this letter of intent signed. You have a provision in the contract that says that you can compete except for this thing that's going to be cut off from Wendy Brown. And then it appears that there's evidence in the record that Management Registry changed its mind and said I'm not going to sell it to you without limiting the ability for the new company, the spinoff, to not compete with Management Registry or any of its companies out of state. And that seems to me to be, the district court could have just said, look, nobody's hands are clean here. I'm not going to grant a preliminary injunction. With a couple of caveats to that, if I may. First, there is no signed letter of intent. If you look at the letter of intent, they reference a letter of intent that no one could even agree on, okay? So all the way through, they say there's a letter of intent, there's a letter of intent. Judges look at the letter of intent, ask where the signed document is. We could not even reach a letter of intent. But to your point, when Al Brown signed the stock purchase agreement, which the judge below did not address, and that's one of our major concerns. The stock purchase agreement, Al Brown was a seller. And as a seller, he signed a document that said this is the only document. There is no other document. This supersedes all other agreements and it is the only agreement. There is zero reference to any quote unquote buyback. We acknowledge, and we have throughout, there were negotiations ongoing. There was never a letter of intent signed. There was never a contract signed. So when you're talking about whether or not there are unclean hands, we understand that there's negotiations going on. But to the extent that Ms. Brown believed that she was entitled to some type of relief, it's not to take the company. If you look at what we presented, I want you to understand the expansive nature of what happened here. She took, there's a declaration from a computer forensic expert. 41,500 lines of data, nine columns. Now lines of data and nine columns doesn't mean that's the pages. That means those are separate documents that were taken on the day that they left, when they solicited the employees and said, we want you to come work with us. And the judge below said that they did that on October 31st, 2017. They took with them 373,000 documents, separate electronic documents, data files, employee records, social security numbers, pay rates, bill rates, customer databases, contracts, everything. Then they sent emails out to the employees and said, ignore this other company. They aren't your employer. We've always been your employer. We are the employer. We paid $21 million for this company. They stole what has been, but what Al Brown identified as a $2.1 million asset. And in doing so, they signed documents and sent documents out unbeknownst to management registry. They submitted emails before we ever bought the company on September the 8th. And this is in the record from Andrea Smith. She sent an email out to all customers and all employees without us having a knowledge at all, saying a sale just went through. But doesn't your argument lead on the irreparable harm prong, which the district court talked about? Sort of the extent of your damages are $2.1 million. They can be quantified, can't they? I mean, you can quantify, no, you think it's worth more. And where did you provide evidence of that? The goodwill, the contracts, if you look at the Iowa Utilities Board case that we cited in our brief. The future contracts, the reputation damage, telling people that we're not the employer, that we're not the company, that we don't have a contract. They went to Myers and told Myers, they don't have anything to do with you. We are the company. We have been continuing to be the company. Now whether or not we can recover monetary is not exclusive because we do have the goodwill. The customer goodwill with Meyer, with Element, with all of the large substantial companies that we had engagements with. The loss of that goodwill, this court has found that goodwill is sufficient to warrant irreparable harm. We have lost goodwill, and we have lost companies. We lost employees. We lost the relationships that we had with employees. And most critically, and this was never addressed by the court, not only did it not address the stock purchase agreement where Al Brown agreed to stay out of this for two years, to stay out of the market completely. It completely ignored the data that was taken. And that data is, by definition, the computer data that is the confidential brain trust of the company is irreparable harm. But most of the harm has already occurred, it sounds like. And I guess my question for you is, if the harm's already occurred, what in the future could cause irreparable harm? Because that's really what we're asking, is what value will the preliminary injunction continue to have? At this point, it still is ongoing, first and foremost. We still have the loss of business reputation. We still have the loss of the goodwill, the value that we bought in the business. And I don't mean monetary value. I mean the goodwill that we bought in this business has been completely undermined by the theft of the business itself. The taking of the actual computers, we still don't have those computers. When counsel stood in front of the court on November 17th, he advised the court. In the papers, they said, we didn't take a thing. And all their declarations said, nobody took anything, we just walked out. What's the status of the case in the district court? Has it proceeded? It has not. Well, it's been proceeding with some discovery, other than- It's been so long, it's so urgent, instead of filing an appeal and coming up here. We are going forward with discovery, Your Honor. When I say it's still going on, that's the tenor of it. We did have, and I want to explain why it took a while to get here, the tinnage, which is another case. We were waiting on the court below to issue a ruling in that. It's the same exact thing that took place in Illinois with another defendant. And the court below did not ever enter an order after it was transferred on the temporary restraining order. We were wanting all of that to come up to the court together, and we did not get that ruling still to this day. When you moved for the injunction, why didn't you specify what claims you thought would likely prevail? I get the feeling the district court just had to go on its own and look through the ten claims and try to analyze them without your laying it out. Why isn't that grounds enough to say you weren't entitled to an injunction? Local counsel below indicated the manner in which this Minnesota court wanted things done, which was to present it to them and offer to brief any of the issues that the court may deem appropriate. When we presented to the court, we then did, in our oral argument, identify the three bases upon which we were seeking injunctive relief. And we limited it to those three, breach of contract, interference, and then the computer fraud and theft of the computers themselves and the data. Your Honor, I yield my time for rebuttal. Thank you. Mr. Pins, we'll hear from you. Thank you, Your Honor. Thank you, Your Honors. May it please the court, my name is Richard Pins, and I'm here today representing Wendy Brown, Allen Brown, and A.W. Companies. Your Honors, one year ago this upcoming Saturday, Chief Judge Thunheim vacated an ex parte TRO, as you now know, that he had granted 14 days earlier, stating, after analyzing a record, that factual disputes prevent the court from finding that MRI is likely to succeed on the merits. And that MRI has failed to show irreparable injury. Two months later, on January 16, 2018, Judge Thunheim issued a written memorandum, opinion, and order. Wherein he more specifically said that factual disputes in the undeveloped record prevent the court from finding that they're likely to succeed on their contract, on their tortious interference, and on their other claims. And that the plaintiffs did not show irreparable harm in the loss of customers or employees. But most profoundly, the court said exactly what happened here. MRI came running to the court before sufficiently developing either its factual record or its legal theories, and the desire to act quickly does not excuse MRI from its failure to carry its burden of showing that it is entitled to the extraordinary remedy of injunctive relief. On the irreparability of harm, why isn't goodwill enough? If the company's going around, the spin off company is going around, stealing customers and saying bad things potentially about MRI and its big conglomeration of different staffing companies, why doesn't that suffice for irreparable harm? Hard to quantify. It is hard to quantify, your honor, and goodwill may be enough. There are cases out there that say goodwill is enough, but there are also cases out there that say it's not enough. That say where damages are quantifiable, as is the case here, that irreparable harm is not shown. And there are many cases which say that where a district court judge analyzes the questions, including whether or not goodwill is enough, whether or not the loss of customers is enough. And then rules in favor of one party over another based upon that analysis and its application to law, this court should not overturn that unless it is an abuse of discretion. And in this case, what the plaintiffs did, appellants now, is screamed and yelled a lot. You look at their briefs, they offered a lot of platitudes and outrage. A lot of it misrepresentation, a lot of it omission, a lot of it partial statements of the facts. And then exactly as Judge Collin said, left Judge Thunheim to attempt to dig through the slop. In the hopes that he would find something that support them. And now, when he didn't find something that supports them, they come and say, Judge Thunheim ignored this and ignored that, even though those items weren't actually presented to Judge Thunheim. Can't this case move along? It's been a year, right? Your Honor, thank you. My apologies. It sure can, Your Honor. I was hesitant to raise this from the start because I don't want this court to believe that we don't win this case on the merits. But your question, why are we here a year after the fact, is what I am asking myself. Your Honor, no, Your Honor, here's what happened. Here's what happened. They raced to the court on November 3rd, obtained an ex parte TRO. On November 17th, the court vacated that TRO, and they immediately appealed. Now the judge, let's give him the benefit of the doubt, Judge Thunheim did not issue his order until January 16th. But between that initial appeal and the time the plaintiff's appellants actually filed their brief, they made four requests for an extension of time to file their brief. The first three were unopposed, so the court granted them. It was only when we stepped in, when we were appointed counsel in this case or named counsel in this case, and said, it's too late. How is it that they can, with a straight face, stand here and say there is an imminent risk of harm, when they sought four extensions of time? We're a year later. Any- I wasn't talking about what's happened in the district court. It seemed like the case could have proceeded in the district court. Aren't there some things that have been sent to arbitration? There's a separate portion of it, your honor, that has been sent to arbitration. The breach of contract claims made by and against Alan Brown over his employment contract, those claims have been sent to arbitration. There's a separate companion case that counsel referenced that was transferred from Illinois to Minnesota. And then there have been lots of discovery disputes about the scope and breadth of discovery. There have been a handful, I think maybe three depositions taken in this case. We finally- Is there a deadline? Is there a trial date? Finally, finally, as of November 2nd, we have a scheduling order and a trial scheduled for next fall, your honor. Discovery is now commenced. The parties have until December 20th to turn over all documents and depositions are expected to occur after the first of the year. I will also point out to you, your honor, that one of the reasons they alleged for this extension was this Battenich case, the one brought in Illinois that had allegedly identical facts. They moved for injunctive relief in that case. When the case was transferred to Minnesota, the court struck the motion for injunctive relief and gave them the right to refile and they never filed a motion for injunctive relief in that case. So, I go back, when it moved from Illinois to Minnesota, that injunction was pending, the court chose not to rule on it in Illinois. And the Minnesota court said, we are not going to rule on the Illinois motion for injunctive relief if you want to bring it again, bring it again, and they never brought it again. Your Honor, what happened in the district court case is exactly what happened here at this level. Understanding that this court has to find an abuse of discretion, that Judge Thunheim made a clear error of fact, or a clear error of law, once again, appellants have thrown as much at the wall as possible in the hopes that something will stick. And in the hopes that this court will do its work for them. Earlier during his statements, counsel talked about this reply brief. This reply brief is exactly what I'm talking about in this case. If your honors look at page five of that reply brief, you'll find what appellants purport to be a conclusion from Judge Thunheim's opinion and order. When in fact, that conclusion which plaintiff, excuse me, appellant indents and puts under the heading, Judge Thunheim concluded, is nothing of the sort. It's a cobbled together statement of the facts as appellant wishes, Judge Thunheim had ordered them, and as appellant wishes, Judge Thunheim had found in his favor. But as I thought about that cobbled together statement of facts which omits crucial qualifications and sentences in between, it occurred to me that that cobbled together statement of facts, which is purported to be a conclusion on page five of the reply brief, proves that Judge Thunheim didn't abuse his discretion. It proves that Judge Thunheim did exactly what Judge Strass suggested he did. Judge Thunheim considered all of the facts. He dug and he listed the facts. He might not have listed them in the order that counsel wanted them, but he listed them. And then he didn't credit plaintiffs or appellants versions of the facts. Instead, what Judge Thunheim did was say, I see these facts. I see defendant's version of the facts. I see that there is a fact dispute. And that fact dispute precludes me from finding that you've satisfied your burden  on the contract claims, on the tortious interference claims. Couldn't he make findings of facts? He did. He offered a factual background. He said there were disputed facts. Well, what he did, so I apologize. That was me being unclear, Your Honor. What Judge Thunheim did was issue a series of findings. What counsel did on page five of the reply is pick and choose and move out of order those findings and purport that they were a conclusion of Judge Thunheim when, in fact, they were selected versions of Judge Thunheim's findings. But I'm not sure you were unclear. I think the judge did say there were disputed facts. That's exactly right. But couldn't a judge in this context make findings? And he could have said, I rule in favor, I have found X. And that means that there is a likelihood of success on the merits. But instead, what Judge Thunheim said was, based on the underdeveloped record presented by the plaintiff's appellants and my determination that there are facts in dispute, I am unable to conclude that he has satisfied his steep burden of showing that he would be successful on the merits of these claims. Was the goodwill point argued? It's not really mentioned in his discussion of irreparable harm. Was it argued in the district court the way it's been argued here? I don't think it was. I've reviewed, I wasn't the attorney there, but I have reviewed the record. And what I saw in the arguments at the district court was just a lot of, it could be this, you'll find it in the record. But yes, I believe goodwill was referenced. Well, he says it's stated in conclusory terms. So maybe that's the problem. They just, we'll check. But if they just argued goodwill without really fleshing out how it was harmed. Well, that's what Judge Thunheim said, which was that again, counsel just threw as much stuff at the wall as possible in the hopes that Judge Thunheim would favor his decision. And then when at the end of the day, Judge Thunheim didn't choose his version of the facts, but instead chose another version of the facts, he's claiming that that is error. But that is not clear error. These courts have repeatedly said, your honors, that a choice between one of two available interpretations of the evidence does not amount to an abuse of discretion, or that there is no abuse of discretion where the evidence directly supports both parties' claims and the district court chooses one over the other. I should conclude by saying this. I've let slide and tried not in the briefs to get into mudslinging. But one thing that I want to point out is that there's a lot of talk about Wendy Brown doing this and that. But remember, Wendy Brown doesn't have a contract with any of these defendants. But Wendy Brown brought this business over. It was purchased. If it was valued at $2.1 million, then why was it being sold back for $50,000, which is what the deal was, money which had already been provided? Wendy Brown didn't have a contract. Alan Brown, according to the court, had contracts. Now, he's raising the stock purchase agreement today and in his briefs. But you'll find, your honors, he doesn't raise the stock purchase agreement at the district court level. In fact, he focuses on the employment agreement. And I think I heard him say earlier today that the employment agreement is no longer there because of the stock purchase agreement. But that being said, you said, your honor, both parties have done some bad things. I would say that balance isn't equal. The balance is much greater on the plaintiff's or appellant's side. And their mudslinging should not allow them to satisfy their burdens. Thank you. Very well. Thank you for your argument. Mr. Morris, would you care to make rebuttal? Yes, your honor. May it please the court? First, let me address the delays. Counsel ignored the fact that, yes, there was a settlement conference that was ordered and we went through it with the district court. That was in January. Then they switched counsel in February, which delayed it a second time. Then they switched counsel again in May, and it delayed it a third time. Then they switched counsel again in June. And that's when we asked one more time because all of these things have been delayed while they had new counsel four times. So the reason why we're not here before now isn't because we've been trying to delay. It's because we can't get counsel on board for more than two months at a time. With regard to the comment made by counsel, he said, if the district court, and I quoted it here, if the district court analyzes goodwill, then you can't overturn if there's a good basis for it. Problem below is the court did not analyze goodwill. We did address it, and I have it on its page. We addressed it during transcript. If you look at pages starting with 938, we addressed the vast majority of what we addressed was all of the data being taken, the goodwill being undermined, the computer records, the use of our data to support . . . This is in an oral argument? Yes. What about your filings? The filings also addressed in brief. But then it also, if you'll recall, the comment made was we need to present it to the court and offer briefing to the extent the court wants to have that. That was what the local directive was. No, it wasn't a local directive.  It was a choice your client made based on apparently some advice from a lawyer. Yes. And that's what I'm saying . . . No directive from the court. No, no, no, no. You should not develop your arguments. I believe, though, if you look at it, the arguments were sufficiently developed because it's very simple to point out they didn't buy anything. They didn't acquire anything. And yet the ruling from the court, and he says that we cobbled together. These are direct quotes. Ms. Brown's purchase never happened. In mid to late October, the negotiations with Ms. Brown broke down. Allen and Wendy Brown formed A.W. on October 30th for the admitted purpose of directly competing with Management Registry. Allen and Wendy promptly formed A.W. and employed Mr. Berg. A.W. began hiring other employees that had worked for the company that Ms. Brown planned to purchase, and A.W. began servicing clients. Ms. Brown asked the A.R.I. employees, our employees, to work for A.W. and to bring client files and computers with them for the purpose of continuing to service A.R.I., our clients, to service our customers. So if the court below went ahead and found those things, you know, he says that it's not his obligation, but he did. He found that they engaged in the very activities that underlie a proper claim for irreparable harm, and he failed to address, then, the criticality of those components. Your Honor, I see that my time has expired. Very well. Thank you for your argument. Thank you. Thank you both, counsel. The case is submitted. The court will file an opinion in due course. You may be excused and